Seney, J.
On February 4, 1892, the plaintiff filed its petition in the Court of Common Pleas of Erie county averring in said petition in substance the following facts :
That it is a corporation, organized under the laws of Ohio for the purpose and object of owning real estate to be occupied and controlled by it, with the privilege of fishing and propagating fish, bunting, sporting, and the protection of game in and upon the lands owned by it, and in the waters, ponds and streams connected therewith, in the township of Margaretta, county of Erie, and state of Ohio.
That the defendant, The Castalia Sporting Club, is also a *195 corporation organized under the laws óf the state of Ohio, for a somewhat similar purpose and object.
That the plaintiff is the owner in fee of certain premises situated in said township and county (the premises being described by metes and bounds in said petition).
That said premises include within their boundaries the head spring and pond made thereby of Big Cold Creek, and also Big Cold Creek for a distance of one half mile or more from said head spring and pond, and also the race from said Cold Creek to the place where was located, until recently, the Castalia mill and pond, made by a dam erected at that point, and the tail-race from said dam and mill to where it joined again the waters of Big Cold Creek as they flow to Sandusky Bay.
That said spring, ponds, creek, and head and tail-race have existed and been a natural water-course for more than forty years, continuously last past, and for more than thirty years had been used both for the purpose of propelling and running milling machinery, and for the purpose of propagating and growing fish. That the waters of Cold Creek and of said pond and races have been supplied by a spring upon the lands of the plaintiff, at the head waters of Cold Creek, and are also connected by an underground channel from said head spring to the pond upon the plaintiffs land.
That the water of Cold Creek and of said pond and race comes from said underground channel or course upward into said pond, and out through the channel of Cold Creek and said race, and uniting where said tail-race joins with Cold Creek flow into Sandusky Bay.
That the banks and currents of said Cold Creek and of said race are well defined, and have so existed and continued well defined for more than forty years last past. That the water comes from said spring in great volume, and is of a temperature of fifty-two degrees at least in all seasons of the year, and is exceedingly clear ; and for this reasons said waters *196 are especially adapted for the propagation and raising of valuable kinds of fish, and especially of speckled brook trout.
That the plaintiff, in carrying out the purpose of its incorporation, has expended upon said land, for improvement of the water-course in and upon the land, and in buildings erected thereon, more than $30,000. That- it has propagated and is growing and raising large quantities of speckled trout and other kinds of fish.
That said premises, if the waters of Cold Creek and said race are diverted, would become valueless. That in the condition in which they have existed they were, up to the happening of the grievances herein named, of the value to the plaintiff of $150,000.
That the defendant is the owner of certain premises lying along, and including within their boundaries, a certain portion of said Cold Creek lying below the lands of the plaintiff; and the water flowing across the plaintiff’s land, in its natural course, flows along, across, or through the defendant’s lands, after it leaves the lands of the plaintiff; and the lands of the plaintiff adjoin the lands of the defendant.
That on the 4th day of February, 1892, the defendant, well knowing the situation and existence of all the facts hereinbefore stated, and for the purpose and with the intention of diverting the waters upon the plaintiff’s land from the natural watercourse, and for the purpose of drawing said water away from its head stream, and from the course, creek, pond and races where it flowed across the plaintiff’s lands, began, at a point within about 100 feet of the line of the plaintiff’s land, where it adjoined the defendant’s, to bore into the earth and sink a well, and with the express purpose and intention of reaching and striking an underground stream, which is believed, by all persons familiar with the territory in which these waters are, to exist, and thereby draw the water from the spring on plaintiff’s lands. That the defendant is about to dig a ditch upon its lands connecting said well with *197 that portion of said Cold Creek which runs, through the lands of defendant, for the purpose of diverting the said water from said underground passage into that portion of Cold Creek which runs through the lands of defendant, for the purpose of diverting the waters in the springs, creeks, ponds and races upon plaintiff’s lands. That if said defendant is permitted to sink said well and divert said water as aforesaid, it will lower the water in the spring, ponds, creeks and races upon the plaintiff’s lands, and will exhaust and entirely divert the water in the spring, creeks, ponds and races upon the plaintiff’s lands, and destroy and kill the fish there existing, and render utterly and entirely valueless the plaintiff’s said property.
That in the month of March, 1891, the said defendant, its officers and agents, sank one well' upon its said lands for the same purpose, and at said time tapped a portion of said underground passage, and thereby diverted the water from the springs, creeks, ponds and races of the plaintiff, and lowered the water in the said springs, creeks, ponds and races from two to six inches.
The prayer of the petition is for an injunction to restrain the defendant from committing the acts complained of.
Upon these facts, the common pleas court allowed a temporary injunction, thus giving the plaintiff a standing in court.
The defendant, The Castalia Sporting Club, on the 27th day of February, 1892, filed an answer and cross-petition. The legal effect of the answer is, that it denies that the plaintiff has expended upon its premises more, than $30,000; that it denies that the plaintiff’s premises were worth $150,000; that it denies that there is an underground stream or channel of water. It admits that it has done and is about to do all of the acts charged in the petition ; but denies that it is for any other purpose than to promote its own interests; it denies that it is or was for the purpose of diverting the water from the plaintiff’s land, or from any of the sources alleged in the *198 petition, or that the acts done or about to be committed will divert the water; that said acts were for the purpose in a measure to restore the water upon defendant’s land in the same condition as it existed prior to certain acts committed by the plaintiff upon its land, whereby it diverted the water from the natural watercourse, and thus reduced the volume and increased the temparature of the water from its natural state, and it flowed through defendant’s land in such diminished volume and increased temparature.
The legal effect of the cross-petition is, that the defendant, the Castalia Sporting Club, is the owner of certain premises below and adjoining the premises of the plaintiff; that it is engaged in the same business as the plaintiff; that the plaintiff has dug ditches or channels upon the premises, and thereby has diverted the water from the creeks, ponds and races upon plaintiff’s premises, to such an extent that the volume of water when leaving the plaintiff’s premises, and flowing through the natural watercourse (to-wit: the creek) upon defendant’s premises, is greatly diminished, and the temperature of the water is greatly increased; and if permitted, it will destroy or greatly impair the premises of the defendant for the purpose for which its corporation was formed, and the uses and purposes for which the premises for a long time have been used.
The prayer of the cross-petition is for a mandatory writ of injunction, commanding the plaintiff to prevent and stop the further flow or diversion of any of said waters into or through said ditches or channels.
The reply of the plaintiff to this answer and cross-petition is, in legal effect, a general denial.
Upon the issues thus joined, the common pleas court dismissed the petition of the plaintiff and dismissed the cross-petition of defendant; thus leaving both clubs where they were before they thought they had a law suit. From the action of the court both clubs perfected an appeal to this court.
*199 On the 10th day of November, 1893, the plaintiff, by leave of this court, filed what is termed a supplemental petition. The legal effect of the allegations contained in the supplemental petition, that were not averred in the original petitition, is in substance as follows: That since this cause was tried in the common pleas court, and the appeal therefrom duly perfected in this court, the defendant has done, to a certain extent, the very acts complained of in the original petition, and in violation of the injunction of said court of common pleas; and that said acts have caused the diversion of the water in the creeks, ponds and races upon plaintiff’s premises, and have been done at a season of the year when they especially caused great damage to plaintiff’s premises, and will destroy a large quantity of fish upon plaintiff’s land.
The prayer of the supplemental petition is, in addition to the prayer of the original petition, that the defendant be required to restore the water on the plaintiff’s premises to the condition it was in before any interference by said defendant.
The legal effect of the reply to this supplemental petition is a general denial.
Upon all these pleadings and the issues thus joined, without any objection as to the nature and character of the different pleadings (with the exception of the cross-petition, which we will notice hereafter,) this court has heard the case fully, even to the extent of hearing evidence as to the condition of the different premises up to the date of the close of the trial, which was some time after the respective pleadings were filed in this case — however, without objection.
The case is an interesting one in many respects, extremely novel in its character. It has been presented to the court with marked ability, showing extensive research; somewhat tedious in the mass of testimony upon immaterial facts, and large amount of cumulative evidence upon material facts, which were not and could not seriously be disputed. But *200 when all is said and done, the question is': What are the facts ? When the facts are ascertained by the court, the case is determined by well-known, settled principles of law, that are not surrounded by anything difficult.
In addition to the facts admitted by the pleadings, which are taken as true upon the issues joined by the petition, supplemental petition, answers and replies thereto, we find the following facts:
That the plaintiff has upon its premises a flowing spring, or, as it is termed, a blue hole; also, it had a pond of water covering about fifteen acres, which pond, by the acts of the plaintiff, was gathered together by means of ditches or trenches, so that the water that formerly covered fifteen acres of plaintiff’s premises, now is confined to the ditches or trenches thus dug, covering only about 2|- acres of plaintiff’s premises.
That from the blue hole and trenches thus dug upon the plaintiff’s premises, and as an outlet thereto, there exists a natural Water-course, known as a race, that extends from the said blue hole across the plaintiff’s premises, and having for ah outlet another natural water-course, known as Cold Creek, which creek flows through the lands of plaintiff and defendant, and other premises.
The water, that comes from plaintiff’s blue hole and the trenches and ditches created by said pond, principally supplies and feeds the natural water-course known at the race, and .the natural water-course known as Cold Creek.
That there existed and now exists upon the defendant’s premises a flowing spring, known as the blue hole, which lies about one-half mile from plaintiff’s blue hole in a northeasterly direction, and nearly in a direct line.
That the defendant dug a well upon its premises close to the blue hole of defendant, which brought forth a volume of water which flowed five or six feet above the surface of the earth, and the stream thus flowing in size of that of an ordinary barrel.
*201 That the defendant, after said flowing well obtained, dug a very large ditch or canal, extending from defendant’s blue hole in a northerly direction across defendant’s premises, and flowing into Cold Creek in that part of the creek on defendant’s premises, and not on plaintiff’s premises.
That after said well of water was obtained, another spring broke out upon defendant’s premises close to defendant’s blue hole.
That the waters from defendant’s blue hole, defendant’s well, and defendant’s spring, are in such close proximity to each other, that the waters commingled together, forming one body of water, that has for an outlet the ditch or canal dug by the defendant, and which waters are carried off by it.
That as a result of the digging of the well and the digging of the ditch or canal by the defendant, the water that flowed from the plaintiff’s blue hole ceased flowing, and thereby plaintiff’s blue hole ceased to be a feeder for the natural water-course known as the race, and the water that had theretofore flowed from said plaintiff’s blue hole, was thereby diverted from the natural water-course. That on account of the acts of the defendant as aforesaid, the fall of the water in plaintiff’s blue hole was eleven inches.
That along the line between plaintiff’s blue hole and defendant’s blue hole at different times have broken out several other springs from natural causes.
That underlying the earth upon this line are different formations, underlying which is found the limestone rock.
With these facts found, what do they signify? They establish two centering and important facts, viz: Geology tells us, witch these phenomena, that the water that flows through the plaintiff’s blue hole is furnished from a channel or stream of water underneath the surface of the earth, and that it is not furnished by percolation ; and second, that the acts of the defendant in digging the well and canal have diverted the water in a natural water-course upon the surface. Can the *202 question be asked how? If so, it is easily answered : by destroying the feeder, viz : plaintiff’s blue hole. You destroy the natural water-course, viz: the race, viz: the Cold Creek that plaintiff’s blue hole feeds.
With these two centering and important facts established, what is the law? Although numerous authorities are cited, the law is found in a “ nut-shell,” so to speak, in a very few words, viz :
A party can not materially divert waters from a natural water-course, whether that natural water-course if found above or below the surface of the earth, to the substantial injury or damage of another. Why ? Simply because property rights attach to a natural water-course as much as they do to the land itself.
The only difficulty found between a surface stream and a subterranean stream, is this : with a surface stream, the natural water-course is clearly defined, whence it comes and whither it goes; with a subterranean stream it is not so easily ascertained. So that it has been repeatedly held by the courts of last resort of this country and England, that no property rights attach to water upon the premises of another produced by percolation. And the reason is, no one can tell, as to water thus produced, whence it comes and whither it goes. It is here to-day, and gone to-morrow. But when it can be ascertained whence it comes and whither it goes, it becomes a known and definite stream, and as such is governed by the law that controls surface natural water-courses.
Suppose the plaintiff’s hue hole and pond is supplied by water from percolation; thus supplied the blue hole and pond have supplied the natural water-course with water for along period of time, so that property rights in the natural watercourse have been acquired ; is there any authority that holds that the water in the blue hole and pond can be diverted, and thus the natural water-course destroyed, for the reason that it was water procured by percolation ? We know of none, and believe that such a holding would be contrary to well- *203 known principles of law. The facts thus supposed would be the case before us if the water was supplied by percolation instead of a known stream or channel of water. The Irish Report cited by counsel, may apply to a case before the earth is disturbed, before the well is dug; the court holding that the surface indications must show to an ordinary person, or convey to him the knowledge from the surface indications alone, that underneath the surface is a defined channel or stream of water. For myself, I doubt its soundness. Why, if the knowledge is obtainable from other sources other than surface indications — for instance in the case before us, from the report of Prof. Newberry, State Geologist of Ohio, —why should that not answer the purpose as well as surface indications? Be that as it may, it is not the case at bar. The well is dug; the canal is made; result is known. Surface indications or not, science says the result could not be produced other than by a well defined channel or stream of water, and no one says nay to the proposition.
Applying this law to the facts thus found, the defendant will be perpetually enjoined from digging any well upon its premises, or causing anything to be done thereon that will interfere with or divert the water as it flows from plaintiff’s blue hole as it existed at the time before the flowing well was dug by the defendant upon its premises.
We are powerless to suppress this flowing well ’dug by defendant. The plaintiff is entitled to have the water restored to it as it was before the well and canal were dug. We shall restore it by mandatory injunction, requiring the defendant to erect and maintain some barrier or dam that will restore the water in plaintiff’s blue hole to what it was originally, to-wit; so that plaintiff’s blue hole will flow not less than — inches, as it flowed originally. If counsel can agree upon -what shall be done to accomplish this purpose, the order will be so made; otherwise, the court will refer this matter to a competent man to ascertain and to make his report on or before the 24th day of February, A. D. 1894.
*204 It is urged in the argument that the defendant is entitled to all the water that flows through the blue hole upon defendant’s land, and all the water that flows through the spring' that broke out upon defendant’s land, upon the same .principle that gives to the plaintiff all the water that flows through the blue hole upon plaitiff’s premises. There is no doubt of it. The court is then asked the question, how can they have their water, if a dam or barrier is constructed ? The act of the defendant in digging this well, the act of the defendant in digging the canal, caused the waters from the blue holes, spring and flowing well to unite in one body of water, so that it is impossible to separate the waters. If by the erection of a dam or barrier for the purpose of restoring to plaintiff’s premises the water that belongs to it, it should happen that water is taken from the blue hole and spring on defendant’s premises, a court of equity would turn a deaf ear to a complaint made by the defendant upon the well-known principle of equity that “he who seeks equity must do equity —that a party can not take advantage of its own wrong.
In addition to the facts admitted by the pleadings, which are taken as true, upon the issues joined by the cross-petition of the defendant and the answer thereto, we find the following facts :
That there formerly existed upon plaintiff’s premises a pond of water covering about fifteen acres; that the waters from this pond had as an outlet, the natural water-course known as. the race; that the plaintiff dug upon this fifteen acres certain trenches or ditches for the purpose, and which in fact did, gather together the waters upon the fifteen.acres into these trenches or ditches, which covered about two and one-half acres. That the outlet of these trenches or ditches is the same at the outlet for the pond.
That by the act of the plaintiff the waters thus diverted were not dimished in volume, and were not increased in temperature, as they were delivered into the natural watercourse, viz. : the race.
*205 That the plaintiff dug upon its premises what is known as a medow stream, which stream consisted of winding loops, three and a half miles in length. That the inlet of said meadow stream tapped the natural water-course known as Cold Creek, and that the outlet of said meadow stream tapped the same water-course upon plaintiff's premises, a short distance from the line between the premises of the plaintiff and the premises of defendant.
That the result of the making of said meadow stream 'was to divert a part of the waters from the natural water-course (Cold Creek) into said meadow stream, through which it flowed, so that when the water thus diverted entered into the natural water-course, it diminished in a slight degree the volume of water flowing originally through the natural watercourse, and increased the teparature of the water thus diverted.
That said -water as delivered to the defendant's premises through said natural water-course (Cold Creek) was not materially diminished in volume by means of said diversion, and was increased in temparature not more than six degrees by means of said diversion.
That said increase of temperature does not materially affect the business of the defendant.
That said meadow stream was constructed by the superintendent of the premises of the defendant; its commencement, its various stages of construction, its ending, were all well known to the officers and directors of the defendant corporation, at all times from the commencement of the work until the work was finished.
The effect and result of the work as it was finally determined by its construction, was well known by the officers and directors of defendant corporation at the commencement of of the work and during,its progress.
That no objection of any kind was made by the defendant to the work being performed by its superintendent, for the plaintiff, in the construction of the meadow stream, either at *206 its commencement, during its progress, or when finished; the first objection being made by the defendant when this action was commenced, about two and a half years after the meadow stream was completed.
That the meadow stream was constructed by the plaintiff for the sole purpose of benefiting the business of plaintiff, and was constructed at the cost and expense to plaintiff of a large sum of money.
It is not the purpose of a decision of the circuit court to go into detail as to the evidence that justifies the facts found by the court; but in the case before us, on account of an admission in the pleadings, it is urged by counsel that the increase in the temperature in the water caused by the diversion of the water on account of the, meadow stream, as delivered upon the premises of the defendant, should be greater than we have found the fact to be. That admission is this: “That the water comes from said spring in great volume, and is of a temperature of 52 degrees at least in all seasons of the year, and is exceedingly clear.”
Although evidence was introduced upon this question, it is incompetent as against this admission in the pleadings; but the evidence sustains the admission, hence no harm was done by its introduction. The meadow stream could not affect the temperature of the water at the spring (which is the extent of the admission), for the reason that the meadow stream is some distance below the spring. The defendant, in law, is interested solely in the volume and quantity of the water as delivered upon its premises through the natural water-course. It may be 52 degrees at the spring, and when flowing through the natural water-course until it reaches, the defendant’s premises, the temperature of the water may be increased, notwithstanding there had been no diversion of it. The question of fact is : What was the temperature of the water in the natural water-course, as delivered upon defendant’s premises before diversion by the meadow stream, and what was the temperature of the same water after diversion ? This is the ques *207 tion of fact we have found, notwithstanding the admission in the pleadings.
With these facts found upon the issues joined upon the cross-petition, what is the law? As we have said: “A party cannot materially divert water from a natural watercourse.” Hence it follows that all diversions of water from a natural water-course are not unlawful. The diversion, to make it unlawful, must be material. That materiality is measured both by quantity and quality. The legal right of an adjoining proprietor to the waters flowing through a natural water-course is also well-settled by a well-known principle of law, viz : That the water delivered upon the premises of an adjoining proprietor must be delivered in substantially the same condition, both as to quantity and quality, as the water flows through the natural water-course. As we have found the fact to be that the water is delivered upon the premises of the defendant in substantially the same condition that it flows through the natural water-course (Cold Creek), it follows that the construction of the meadow stream by the plaintiff was not an unlawful diversion of the waters from the natural water-course. But the prayer of the cross-petition is not to enjoin the construction of the meadow stream, but to destroy it by closing it up by a mandatory injunction from this court.
In view of the facts found by the court, should this be done? The meadow stream was made with the full knowledge on the part of the defendant that it was to be made— when it was commenced, its progress, its ending — with full knowledge as to the effect and result of the construction. It had no other effect, than the result anticipated by the defendant when the meadow stream was commenced. It was made at the expense of the plaintiff in a large sum of money. Applying to this state of facts two well known principles of equity, and the question is answered, viz: “ When a party-won A speak when he should, he will not be permitted to speak *208 when he would;” and, "When a party, by his failure to speak or act when it is his right so to do, and by silence, acquiesces in an act, he will be estopped from claiming the' act should be undone, when it will cause an injury or damage to the actor.” It is urged in argument that the effect of this is, that, as the plaintiff is the upper proprietor, it could so further control the water of this natural water-course, by reason of this meadow stream, by dam or otherwise, as to wholly destroy the business of the defendant corporation. It probably could. But has it done so, or will it do so? The pleadings do not aver it; the evidence does not support it. “ Sufficient unto the day is the evil thereof.”
It is further urged in argument that the question of estoppel is not claimed by the counsel representing the plaintiff, and hence, by inference, it is said the court should not consider it. If the circuit court should decide cases simply upon the claims of counsel made in argument, in many, many cases the court, when it came to consider the case, would often find itself at sea, without rudder or compass. The facts that may or may not create an estoppel, arise in the case, and whether counsel representing plaintiff makes the claim or not, it may be the same counsel, or another, may make it in a higher court, and it would at least be embarrassing to the court to be reversed upon a question in the case that the court has paid no attention to, from the fact that counsel in argument made no claim concerning the question.
It is further urged in argument that the question of estoppel does not arise in the case, because it is not pleaded. Upon the issues joined by the pleadings in the case, the evidence which creates an estoppel was competent upon the issues jpined. When that exists, the court will apply the law of estoppel to the facts as found by the evidence, notwithstanding the facts that create the estoppel are not pleaded. In support of the proposition, we cite 4 Vol., Ohio Digest, page 151, paragraph 7, which I quote :
“ The rule that an estoppel should be specially pleaded does *209 not apply where the fact rendering the estoppel important is not disclosed in the pleadings, and there was therefore no opportunity to plead. The evidence out of which the estoppel arises being competent upon the issues joined, the court should have applied the estoppel, though not pleaded.” Bank v. Flour Co., 41 Ohio St. 552.
It is further urged in argument that the facts set forth in the cross-petition are not the subject of a cross-petition in this action, and the question is made by interposing a general demurrer to the cross-petition, and objecting and excepting to the evidence introduced upon the trial in support of those facts.
The subject-matter of the petition in the case is the interference with or diversion of water from a certain natural water-course. True, the claimed diversion is accomplished by the specific acts charged. The acts are simply the means, the substance is the diversion. In the cross-petition,'the subject-matter is the same as in the petition, but the claimed diversion-, is accomplished by other specific acts charged. The subject-matter being common to both pleadings, we think that the' cross-petition was properly filed under sec. 5071, of the Revised Statutes, which provides: “ That the defendant may claim in his answer relief touching the matters in question in the petition against the plaintiff,” etc. And when so claimed, under sec. 5059 of the Revised Statutes, it is a cross-petition, which section provides : “ Answer; which, when affirmative relief is demanded therein, may be styled cross-petition.” Entertaining these views, the demurrer to the cross-petition will be overruled, the objection to the introduction of the evidence will be overruled, and the cross-petition will be dismissed.
As an incident to the proceeding the plaintiff filed a motion in this court for an order of attachment against the defendant for contempt of court for disobedience of the preliminary injunction granted by the court of common pleas. If this injunction was in full force after the common pleas vacated it upon a *210 hearing of the case upon its merits and an appeal was duly perfected in this court, then the defendants are guilty of contempt of court; for after the appeal, the evidence clearly shows, they did acts which the preliminary injunction restrained them from doing. The majority of the court, following a decision of this court when rendered by the regular members of the court, held that the perfecting of the appeal restored the preliminary injunction, hence the defendants are guilty of contempt of court, myself dissenting. It would accomplish no purpose to explain why, by calling attention to the different sections of the statutes regulating the subject; but it has occurred to me in this case (which makes me stronger in my notion of a contrary opinion than that held by this court), viz.: there is no section of the statutes that I am aware of that confers jurisdiction upon the circuit court to enforce an order made by the common pleas court. If there is, how can this court enforce an order made at one time by the court of common pleas and afterwards vacated by. the same court, that had complete jurisdiction over the subject-matter ? If there is any contempt, it is the contempt of the court of common pleas that made the order, and not the contempt of the circuit court, which has not made any order. However, we all agree that no penalty should be imposed other than has already been imposed by the order made at Sandusky, to erect a temporary dam.
E. B. King, and Brown & Geddes, attorneys for the plaintiff.
E. D. Potter, Jr., J. E. Ingersoll, and L. W. Hull, for defendants.
The defendant corporation will pay two-thirds of all the costs, and the plaintiff one-third of all the costs. Execution awarded, and the ease remanded for execution.
Bentley and Haynes, JJ., concur.